## Curtis A. Connaway

### *vs.*

## Custis W. Wright's Administrator.

Sussex, March T. 1883.

*Specific performance ; substitution of oral contract for prior written contract ; evidence.*

1. "Specific performance," as applied to contracts, may be defined as the actual accomplishment of a contract in its precise terms; but in a given case (as when exact fulfillment is impracticable) it may mean substantial performance, or such a performance as will do justice to the parties under the circumstances.

2. A main ground of the jurisdiction of equity in specific performance is that it is capable of affording relief not obtainable at law, as it may sometimes relieve notwithstanding defects or a failure to perform at the day.

3. Equity regards the substance of the agreement and the object and intention of the parties; it will not, therefore, permit nonessential terms to be set up as a reason for refusing to fulfill.

4. The granting or the withholding of a decree for specific performance is in the discretion of the court;· and in every case the question must be whether the exercise of the power of the court is demanded to subserve the ends of justice.

5. A valuable consideration, particularity, certainty, mutuality and a necessity for performance are requisites upon which the equity of a case for specific performance arises.

6. A surety for money to be advanced to a third party has a right to demand that the advance should be made according to the letter of the agreement; and a substituted performance (as an advance of goods instead of money), unless by his consent clearly shown, operates in discharge of his liability.

7. Where the defendant sets up a parol variation in defense to a bill for specific performance of a written contract, if the complainant assents thereto, he may in general amend his bill and have a specific performance of the written contract with the variation so set up.

8. If the complainant has attempted in the first instance to commit a fraud, or if the claim is wholly inequitable, or there has been great laches, the court may, upon the fact of the omission of part of the contract being shown, dismiss the bill notwithstanding the complainant offers to take his order for a specific performance of the contract as modified, by supplying its omissions.

9. Where an answer to a bill for specific performance sets up a contract different from that charged in the bill, the complainant cannot·have a decree for the performance of such contract without amending his bill so as to insist upon it.

10. Where a bill sets up one agreement, and the answer denies it and sets up another, the bill must be dismissed, with costs.

11. Where a contract is produced in writing, the writing is not only the best, but the only evidence of the contract; and the presumption that the parties intended it to express their purpose will not yield to anything short of clear proof of fraud or mistake.

12. A complainant seeking the specific performance of a contract is bound to establish, clearly and satisfactorily, the existence of the contract, and its terms. If certainty in the proof be wanting, or if the testimony be contradictory or doubtful, a decree for specific performance will be refused.

13. Where a bill for specific performance set out a contract in writing and alleged that a different oral contract had been substituted therefor; and it appeared that the complainant had not performed the original contract on his part; and the evidence as to the alleged substituted contract, with which he claimed to have complied, was

doubtful and conflicting,—*Held*, that no decree for specific perform-
ance could be made.

BILL FOR SPECIFIC PERFORMANCE.—The facts and ques-
tions presented are fully stated in the opinion.

*Charles M. Cullen* and *Jacob Moore* for the complainant.

*John H. Paynter* for the defendant.

THE CHANCELLOR.—The bill is in the nature of a bill for
the specific performance of a contract.

"Specific performance," as applied to contracts, may be
defined: "The actual accomplishment of a contract by the
party bound to fulfill it. It is the performance of a contract
in the precise terms agreed upon,—strict performance. The
phrase may mean, however, in the given case (as where the
exact fulfillment of an agreement according to its letter by
the party is not practicable), not literal, but substantial per-
formance, or such a performance as will do justice between
the parties under the circumstances."

A main ground of the jurisdiction of courts of equity in
specific performance is that they are capable of affording re-
lief not attainable at law ; the latter requiring the plaintiff to
show precision on his part in complying with all the terms of
the agreement, while the former sometimes relieve notwith-
standing defects or failure to perform at the day.

Courts of equity regard the substance of the agreement
and the object and intention of the parties. They will not,
therefore, permit terms that are not essential to be set up as
a reason for refusing to fulfill.

The granting or the withholding of a decree for specific
performance is in the discretion of the court, neither party
to a contract being entitled. By this is meant, not the exer-
cise of an arbitrary and capricious will, governed by the mere
pleasure of the court, but as compared with the absolute right
of a party to a judgment at law for damages upon the breach
of a contract,—a sound judicial discretion, controlled by fixed

rules and principles in view of the special features and inci-dents of each case.

In every case the question must be whether the exercise of the power of the court is demanded to subserve the ends of justice; and unless the court is satisfied that it is right in every respect, it refuses to interfere. A valuable considera-tion, particularity, certainty, mutuality and a necessity for performance are requisites upon which the equity of the case arises.

The bill in this case sets out an agreement in writing, under seal, by which C. W. Wright deposited with C. A. Con-naway a certificate of thirty shares of bank stock, of which twenty shares were to be collateral security for the sum of $1,000, which Connaway had advanced to Smith and Carpenter for the purchase of railroad ties, and which shares were again to belong to Wright when he paid Connaway the money so ad-vanced. Literally, the original agreement between the parties is as follows :

Georgetown, Delaware, Aug. 25, 1874.

This day Custis W. Wright has placed with Curtis A. Connaway $1,500 in stock in the Farmers Bank of the State of Delaware, at Georgetown, one thousand dollars of which he is to retain as collateral security to a certain sum of $1,000, which he has advanced to Smith and Carpenter to purchase ties and timber to be used in the construction of the B. & F. Railroad. The said Custis W. Wright is to have the shares of stock at any time he pays the said sum of $1,000.

Witness my hand and seal.

CUSTIS W. WRIGHT. [Seal.]

If this agreement is to be considered unambiguous, the seal alone saves it from being *nudum pactum*, for the words used are " has advanced," not " will advance."

If, however, the agreement may be considered on its face ambiguous, it may mean either that the advance has already been made, or that it was futurely to be made.

The bill and testimony in support of the complainant's claim gives the latter construction, in view of which I will consider the case as disclosed by the testimony.

By the complainant's statement, the advance was to be in the future.

By the contract between Connaway and Wright, which is set out in the agreement, the advance to be made was to be of cash, and for nothing else was the pledge of the stock to be security. It is not alleged that Wright received or was to receive any benefit from the transaction, but the benefit was to accrue only to Smith and Carpenter. He was, through the pledge of his stock by the deposit of the certificate, in the position of a surety for the payment of that which was the debt of Smith and Carpenter. Occupying this relation he was entitled to the exercise of the highest degree of good faith, and therefore entitled to demand that the advance should be made according to the letter of the agreement.

A substituted performance, unless by his consent clearly shown by full proof, was a departure from the contract, in violation of his rights, and operated in discharge of his liability.

It is not pretended that Connaway advanced money as stipulated, but it is set forth that the contract was modified by the consent of Wright and Smith and Carpenter, and that the complainant, Connaway, by express agreement of Wright and the contractors, Smith and Carpenter, furnished ties and timber to the amount of $1,000 in lieu of the money stipulated in the agreement.

If this allegation of the bill be not clearly established by the proof, it is unnecessary to consider any other question, either of law or fact, arising out of the pleadings or evidence, for a failure on this point is fatal to the complainant's equity.

There is no writing to attest any such change of agreement, and whatever testimony is adduced tending to show it rests in parol.

It may not be amiss, here, to state the rule in respect to a contract with variation sought to be enforced by the decree for specific performance. Where the defendant sets up a parol variation in defense to a bill for the specific performance of a written contract, if the complainant assents thereto

he may, in general, amend his bill, and have a specific performance of the written contract with the variation so set up; for under such circumstances there is a written admission of each party to the parol variation.

It would depend, however, upon the circumstances of each case whether the court will dismiss the bill or enforce the contract, taking care that the subject matter of the parol agreement or understanding is carried into effect.

If the complainant has attempted, in the first instance, to commit a fraud, or if the claim is wholly inequitable, or there has been great laches, the court may, upon the fact of the omission of part of the contract being shown, dismiss the bill, notwithstanding the complainant offers to take his order for a specific performance of the contract as modified, by supplying its omissions.

Where an answer to a bill for a specific performance sets up a contract different from that charged in the bill, the complainant cannot have a decree for the performance of such contract, without amending his bill so as to insist upon it.

Where a bill sets up one agreement, and the answer denies it and sets up another, the bill must be dismissed, with costs.

In the case of *Smith v. Wheatcroft*, L. R. 9 Ch. D. 223, it was held that the plaintiffs, having amended their statement of claim, asking at the trial to have specific performance with a variation according to the terms of the agreement produced by the defendant, the action would not be dismissed, but judgment would be given for a specific performance with the variation.

The general rule, however, in England, seems to be that where a plaintiff files a bill for a specific performance of a contract with material variations, which variations are not assented to by the defendant, a decree of specific performance will be refused.

Mr. Bispham, in his work on the Principles of Equity, says (§ 381) that "It was and is a well established rule in England, that specific performance of a written contract with parol variation will not be enforced."

The same author remarks (§ 382) that "Although in this country there has been some conflict of authority, the better opinion, perhaps, is that the English rule ought not to be strictly followed; but that, in proper cases of fraud or mistake, a party ought to have the assistance of a chancellor in enforcing a written contract with a parol variation. This was laid down by *Chancellor* Kent in the case of *Gillespie* v. *Moon*, 2 Johns. Ch. 585, cited in 2 Kent, Com. *491, *k*, and has been recognized in several States. In others the case has not been followed, and the English rule is adhered to."

In the case before me there is no pretense of fraud or mistake in the drafting of the original contract. Whatever was or was not intended by it in other respects, this is certain: its character was, so far as respects the deposit of the certificate of stock, that of collateral security to something else, and not as the acknowledgment of, or in satisfaction of, an original indebtedness on the part of Custis W. Wright to Curtis A. Connaway. The deposit of the certificate of stock could not have been intended, at the time of the deposit, as payment or security for the payment of the ties and timber which Isaiah Connaway says was afterwards delivered by C. A. Connaway, his father, to Smith and Carpenter, nor as collateral security for the payment of the same, because it is alleged and proved in the bill and by the said Isaiah Connaway that there was a change in the contract for money to material; and of course if there was a change, it was after the contract was made. If, at the time of making the contract, the change had been agreed upon between the parties, the deposit of the certificate of stock would have been stated in the contract to be, not as collateral security for $1,000 advanced, but as collateral security for the price of materials then in the possession of the said Curtis A. Connaway, or thereafter to be delivered by him to Smith and Carpenter.

There is a distinction between seeking and resisting specific performance, as to the admission of evidence. It was decided in *Woolam* v. *Hearn*, 7 Ves. 211, 2 Lead. Cas. 920, that though a defendant resisting a specific performance may

go into parol evidence to show that, by a fraud, the written agreement does not express the real terms, a plaintiff cannot do so for the purpose of obtaining a specific performance with the variation.

There was no necessity for the remark of Mr. Bispham, that "The better opinion, perhaps, is that the English rule ought not to be strictly followed; but that, in proper cases of fraud or mistake, a party ought to have the assistance of a chancellor in enforcing a written contract with a parol variation."

The cases of fraud or mistake were always the subject of equity cognizance, both in England and in this country; and the English rule upon the subject of the admission of parol evidence for the purpose of obtaining a specific performance of a contract with a variation has no relation to cases of fraud or mistake, but is entirely independent of them.

But I will not enter into the consideration of this subject now further than to remark that, where a contract is produced in writing, the writing is not only the best but the only evidence of the contract. This results from the natural inference that the parties intend the instrument to be the repository of their purpose, and omit nothing which it is material to introduce. Although founded in fact, the presumption is drawn by the law, and will not yield to anything short of clear proof of fraud or mistake. Parol testimony is altogether inadmissible to show that the contract was different from the one reduced to writing, unless it can also be shown that the party was fraudulently deceived and misled as to the contents of the instrument.

In substance, the testimony of Isaiah Connaway is this: That the contractors for building the B. & F. Railroad, Smith and Carpenter, being in need of money to enable them to perform their contract, applied to the complainant personally and through their attorney for the loan of $1,000; that the complainant refused to make the loan; that the attorney then requested the witness to prevail on his father to advance that amount to said contractors; that he did prevail with his father to make the advance; that the contract between

Wright and Connaway herein set forth was then drawn and said certificate of stock deposited by Wright to Connaway; that no money was in fact advanced or loaned; but that, by agreement between all the parties, Wright, Connaway, Smith and Carpenter, ties and timber to the amount of $1,000 in value were to be substituted in place of the money,—the complainant having such articles on hand which could be delivered more expeditiously than if purchased from other parties; that the witness had personal knowledge of all these transactions between the parties, and that he not only heard all the parties speak upon the subject, and that they were not only privy to, but were present, when all these matters and things were transacted. He also swears to the delivery of the ties and timber to the value of $1,000 by the complainant to Smith and Carpenter solely on the faith and credit of Custis W. Wright; and that he does not believe his father was ever paid the $1,000,—stating his reasons for such belief.

The case of the complainant, even considering the contract upon its face ambiguous and capable of explanation by parol, must stand or fall upon the truth or falsity of the alleged substituted agreement; and the only two witnesses who have spoken or could speak in respect to it are Isaiah Connaway and Amos Y. Smith.

The testimony of the former supports fully the allegations of the bill, and establishes the substituted contract. If such, also, is the testimony of Smith, then the complainant's case will be established by two witnesses. If, however, the testimony of Smith contradicts that of Isaiah Connaway in respect to matters and things necessary and material to be proved, and without the clear and satisfactory proof of which the complainant cannot have a decree, then neither witness being impeached otherwise than he impeaches himself by his testimony, and both being equally credible, or at least being unimpeached as to general reputation for speaking the truth, the case of the complainant will fail, and the decree prayed in his behalf must be refused.

A complainant seeking the specific performance of a con-

tract is bound to establish clearly and satisfactorily the existence of the contract, and its terms. If certainty in the proof be wanting, or if the testimony be contradictory or doubtful, a decree for specific performance will be refused.

Both the complainant and the defendant examined Amos Y. Smith as a witness in the cause, and therefore vouch for his credibility. The complainant did not examine him as respects the loan of money, the contract between Wright and Connaway, or the alleged substituted contract, but in respect to some other matters. He was examined, however, and gave testimony under the defendant's commission, in respect to all the material matters to which Isaiah Connaway was examined, especially as to the loan or advance of money by Connaway to Smith and Carpenter, the contract between Wright and Connaway, the sale of ties and timber by Connaway to Smith and Carpenter, and the indebtedness of Smith and Carpenter to Connaway. Without extracting at large from his testimony, it is sufficient to say that, in respect to nearly every material matter and thing which Isaiah Connaway declared was done with the privity, knowledge and consent of Smith and Carpenter, Smith's testimony is flatly contradictory to that of Connaway.

Smith says that he has no knowledge of the existence of any contract between Wright and Connaway for the delivery of $1,500 in stock, other than that Connaway said something to him after the death of Wright about having a certificate of stock, but that, it having no relation to his and Connaway's business, he, the witness, gave the remark little or no attention, but that Connaway remarked that it was only a private deal between Wright and himself. Smith denies the loan or advancement of money to Smith and Carpenter. He states that early in August, 1874, which is about the time that Isaiah Connaway swears that Smith and Carpenter were seeking the loan of $1,000 from his father, that they, Smith and Carpenter, had placed $150,000 worth of their state bonds; and at that very time Wright had in hand of their money more than $20,000.

He disclaims all knowledge that either Connaway or Wright ever used their own money in making purchases for Smith and Carpenter, and states that Connaway was to receive from the sale of the state bonds belonging to Smith and Carpenter money with which to purchase the ties and timber for Smith and Carpenter; and that upon a settlement made in 1875, after the death of Wright, between himself and Connaway, he made the last payment to Connaway due him,. which was by the delivery to him of Delaware state bonds to the amount of $1,000.

In fact it is difficult to conceive how the testimony of any two witnesses, upon all the material and essential particulars of the complainant's case, could be more conflicting and contradictory than the testimony of Isaiah Connaway and Amos Y. Smith. Their testimony is perfectly irreconcilable, and the proof of the substituted parol contract, therefore, totally fails.

The complainant having stated in his bill and proved by his witness that no money was advanced as a consideration for the delivery of the certificate of stock, or for collateral security of which the certificate was deposited, of course no decree can be made that the defendant pay the $1,000, with its interest, or assign the said stock, as prayed in the bill; and the alleged substituted contract not being proved, no decree can be made for its specific performance.

Much was said in the testimony, and more in the argument, in respect to a check of $1,500, given by Curtis A. Connaway in favor of William A. Gum, Treasurer of the B. & F. Railroad Company, by Gum delivered unindorsed to Amos Y. Smith, and by Smith handed over to Custis W. Wright, who placed it in his safe. But little need to be said in reference to this check. It has never been paid by Curtis A. Connaway, or anyone else. The proof is that in fact it never was intended to be paid, or even to be presented for payment.

Certain subscribers to the stock of the company wished to pay their subscription. They delivered ties for the construction of the road, and gave orders upon Curtis A. Connaway, who, doubtless, was purchasing for Smith and Carpenter, the

contractors. Connaway gave his check to Gum, with the request that it should not be presented for payment; Gum receipted to the subscribers of stock for the amount of their subscriptions, being about $1,500, the same as that of the check; Smith and Carpenter received the ties in payment for that amount of what the railroad was owing them for building the road, and thus in fact themselves paid for the ties. Connaway's check, which was handed to Smith, was kept by him as a memorandum proper in a final settlement with Connaway. Connaway never in fact paid for the ties, either with his own money or with Smith and Carpenter's; and although, according to the testimony of Smith, Connaway appears to have charged Smith and Carpenter with the ties, yet after being told by Smith that the ties were never paid for by him, but by Smith and Carpenter, he subsequently, after the death of Custis W. Wright, struck this item out of his bill against Smith and Carpenter.

The attempt was made in the argument to treat this check as a payment for ties sold by Connaway to Smith and Carpenter, and thus to show an indebtedness, or rather a liability, on the part of Wright to Connaway under the contract, pledging the bank stock as collateral security. That check is still in existence unpaid; and if any person supposes that he has any rights in respect to it, the courts of law are open to such person, where those rights, if they exist, may be asserted.

No indebtedness of Smith and Carpenter for which Wright was surety, or had pledged stock as a security to Connaway, has been shown to the court. If such indebtedness, in fact, existed, the complainant must have had the evidence of it by book of account, orders, or otherwise; and, not furnishing such evidence, the presumption is strong that no such indebtedness existed, and that the statement of Smith, if true, that the final payment by him to Connaway of a $1,000 Delaware state bond closed the accounts between them, and that Connaway was fully paid whatever had theretofore been due him by Smith and Carpenter.

The bill is therefore dismissed, with costs.