LEONARD ALDRIDGE, by his duly authorized agent, Dan Campbell Holmes,

*vs.*

FRANCO WYOMING OIL COMPANY, a corporation created by and existing under the laws of the State of Delaware, FRANCO WYOMING SECURITIES CORPORATION, a corporation created by and existing under the laws of the State of Delaware, and HENRI LOUIS GAILLOCHET.

*New Castle, July* 18, 1939.

130

*Daniel O. Hastings* and *Ayres J. Stockly,* of the firm of Hastings, Stockly, Duffy and Layton, for complainant.

*Clarence A. Southerland* and *E. Ennalls Berl,* of the firm of Ward & Gray, (*Alexander B. Siegel,* of New York City, of counsel), for defendants.

THE CHANCELLOR: This is a bill to enjoin the amendment of the certificate of incorporation of the Franco Wyoming Oil Company, one of the defendants, by eliminating the provision relating to the issuance of its Class A stock and the special veto rights on the election of directors incident thereto, and issuing common stock in place of it. The case is before the court on the complainant's motion, based on his bill, and on affidavits filed, that a preliminary injunction issue. That motion is opposed by the defendants who filed both answers and affidavits and claim that the facts before the court do not justify the granting of any such relief.

The complainant is the owner and holder of 2000 shares of Class A stock of the Franco Wyoming Oil Company, which he acquired from Pierre Eugene de Caplane and his sons in 1937. That stock had been issued to de Caplane by the Oil Company immediately after the 1927 amendment of its charter but had been subsequently assigned by him to his sons. The complainant, also, owns 25 shares of the common stock of the Franco Wyoming Oil Company and 150 shares of the capital stock of the Franco Wyoming Securities Corporation, another defendant.

At a stockholders' meeting, held on May 17th, 1938, more than a majority of each class of stock then outstanding was voted in favor of the proposed charter amendment, but that amendment has not been carried into effect, and no certificate has been filed in the office of the Secretary of State because of a restraining order previously issued by this court.

Pursuant to the allegations of his bill, the complainant makes three primary contentions:

1. That the certificate of incorporation of Franco Wyoming Oil Company could not be further amended at the stockholders' meeting on May 17th, 1938, because of an oral agreement to that effect made by and between Pierre Eugene de Caplane, Henri Louis Gaillochet and Edwin Chopy, both prior to and at or about the time the certificate of incorporation was amended and the issuance of the Class A stock provided for.

2. That in any aspect of the case Henri Louis Gaillochet, who was a party to that contract, is bound by it and, therefore, could not have legally voted his stock in favor of the alleged charter amendment of May 17th, 1938.

3. That the shares of stock of Franco Wyoming Oil Company registered in the name of Franco Wyoming Securities Corporation were transferred to that corporation under a contract which is tantamount to a permanent voting trust agreement, and contrary to public policy and void; and that the stock in question, therefore, could not have been voted by that corporation in favor of the proposed charter amendment.

Franco Wyoming Oil Company, one of the defendants, was organized by a group of French bankers in 1909, and incorporated in the State of Delaware. On its organization, Pierre Eugene de Caplane, of Paris, France, became its active manager. In 1911 that corporation acquired from Edwin Chopy and Henri Louis Gaillochet, his brother-in-law, both of whom were residents of Paris, certain Dutch rights in the Salt Creek oil field in the State of Wyoming, where it then owned other properties; and together with de Caplane, Chopy and Gaillochet became active in the management of the corporation.

The certificate of incorporation of the Oil Company had been amended from time to time since 1909, but, prior

to 1927, common stock was the only stock issue therein provided for. On April 7th, 1927, at a meeting of the board of directors of the corporation, Pierre Eugene de Caplane, then a member of that board, as well as the general manager of the corporation, reported that it had acquired the McElroy Ranch also in the State of Wyoming, and in connection with that acquisition it had become necessary for the company to issue a large block of additional shares of common stock. Substantially all of the stock then outstanding was held in France, and de Caplane further reported that since this additional stock issue might eventually throw the control of the company to stockholders in the United States, or other foreign countries, it was advisable to take steps to prevent this by creating a small issue of a new class of stock, having certain special rights. In this connection, the corporation minutes show that de Caplane stated in his report:

"It appears that this result (continued French control) could be attained by creating 5000 shares of a Category 'A', to be taken from the increase of the capital stock relative to the acquisition of the new assets, and in which the old stockholders could not make the slightest claim * * * in the future. These 5000 shares of Category 'A' will be distributed by terms of an agreement with the group contributing to the ranch for the safeguard of their interest. These shares will have a special reservation that if 40% of the holders voted against a director he could not be elected."

In the amendment to the charter, adopted by the stockholders May 20th, 1927, the authorized capital stock of the Franco Wyoming Oil Company was to be $4,200,000, divided into 700,000 shares of the par value of $6.00 each. Two classes of stock were provided for: 5000 shares of Class A stock and 695,000 shares of common stock, in which was to be included the 550,000 shares of common stock then outstanding. The par value of both the Class A stock and the common stock was the same, and each class had equal rights, except the charter amendment provided "that no person shall be elected a director of the corporation against whom there shall be cast the votes of forty per cent (40%) in

amount of the outstanding Class A stock." After the amendment, on May 20th, 1927, the outstanding stock issued by the defendant consisted of 5000 shares of Class A stock, having the particular rights above referred to, and 591,869 shares of common stock.

A corporate charter is a contract between the corporation and the State. It, also, regulates and defines the rights of its stockholders, and is, therefore, in some respects a contract between them individually. *Morris v. American Pub. Utilities Co.*, 14 *Del. Ch.* 136, 122 *A.* 696.

Franco Wyoming Oil Company was created under the *General Corporation Law* (*Chapter* 65, *Revised Code of* 1935), and every pertinent provision of the constitution and of that law is, therefore, impliedly written into and composes a part of its charter. *Peters v. United States Mortg. Co.*, 13 *Del. Ch.* 11, 114 *A.* 598; *Keller v. Wilson & Co., Inc.*, 21 *Del. Ch.* 391, 190 *A.* 115; *Havender, et al., v. Federal United Corp., ante p.* 96, 6 *A.* 2d 618.

*Section* 26 of the *General Corporation Law*, as amended by *Chapter* 85, *Vol.* 35, *Laws of Delaware*, which became effective March 2nd, 1927, must, therefore, be read into the charter of Franco Wyoming Oil Company. Pursuant to that section, in the absence of any other controlling provisions, the Oil Company may, therefore, amend its certificate of incorporation on the affirmative vote of a majority of each class of stock, duly issued by it,

"By changing the number, par value, designations, preferences, or relative participating, optional or other special rights of the shares or the qualifications, limitations or restrictions of such rights * * *; or by making any other change or alteration in its Certificate of Incorporation that may be desired * * *; provided that every Certificate of Incorporation, as so amended, changed or altered, shall contain only such provisions as it would be reasonable and proper to insert in an original Certificate of Incorporation made at the time of making such amendment."

The Class A stock of Franco Wyoming Oil Company was issued subject to the rights expressly given by this

section of the statute. *Morris v. American Public Utilities Corporation*, (14 *Del. Ch.* 136, 122 *A.* 696) and *Maddock v. Vorclone Corp.*, (17 *Del. Ch.* 39, 147 *A.* 255) are both examples of the application of *Section* 26, as amended, to particular facts, and, in principle, sustain the general right of the Oil Company to amend its certificate of incorporation, pursuant to the requisite stock vote, by striking out the special veto rights and powers relating to the election of directors, incident to the ownership of 40% of the Class A stock; and by further providing for the elimination of that stock from its charter, and for the issuance of common stock therefor.

In *Morris v. American Public Utilities Company, supra,* in considering whether the preferred stock could be deprived of voting rights, and whether those rights could be wholly conferred on the common stock by a subsequent amendment, the Chancellor aptly said [14 *Del. Ch.* 136, 122 *A.* 705]:

"* * * the original preferred stock of the defendant did possess the right to vote, for the original certificate was silent regarding the right. Can it be taken away? I have no doubt that it may. I base this conclusion on the proposition that the right to vote is not such a change in property rights as to be exempt from the tampering effect of amendment where general power to amend is reserved. It is but an alteration which concerns the internal management of the corporation, and being such is not beyond the reach of an authorized general power to amend."

Neither *Keller v. Wilson & Co., Inc.*, (21 *Del. Ch.* 391, 190 *A.* 115) nor *Consolidated Film Industries v. Johnson* (22 *Del. Ch.* 407, 197 *A.* 489) cited by the complainant, is inconsistent with the defendant's right to amend. In each of those cases, the precise question before the court was whether the owners of cumulative preferred stock, on which there were accumulated and unpaid dividends, had vested, equitable interests in a corporate surplus, which was seemingly fairly applicable thereto, that could not be taken away, without their consent, by the capitalization of such surplus. The 1938 charter amendment in this case merely attempts

to eliminate the special veto rights incident to a certain class of stock, and, therefore, involves a very different question. In fact, the general right to amend a corporate charter, by changing the nature of its capital stock, was conceded in both of those cases.

The complainant claims that the affidavits filed by him show that the charter amendment of 1927 was intended to carry out a previous oral agreement between de Caplane, Chopy and Gaillochet, apparently alleged to have been renewed at the time of that amendment, providing that no person should be elected a director of the Franco Wyoming Oil Company who was not satisfactory to de Caplane, and intended to give them and their families perpetual control of the affairs of the corporation. Chopy and Gaillochet were brothers-in-law, and the claim is made that this plan was intended to prevent them from working together to the detriment of the interests of de Caplane, who was not related to them. Chopy had no children, but both de Caplane and Gaillochet had sons.

The complainant, also, claims that it appears from the affidavits filed that, in order to carry out the purpose of the amendment, it was expressly agreed by and between de Caplane, Chopy and Gaillochet that the special rights incident to the Class A stock should not and could not be taken away by any subsequent charter amendment. That this plan was approved, in principle, by the board of directors, and, pursuant to the agreement of the parties and the vote of the board, all of the Class A stock, to which the special veto rights were given, was issued to de Caplane, Chopy and Gaillochet; 2000 shares being issued to de Caplane, 1500 shares to Chopy, who was the president of the corporation, and the remaining 1500 shares to Gaillochet.

The complainant further claims that it appeared from the affidavit of de Caplane that, though the directors were informed of all of these facts, the minutes do not clearly reflect what he said at the meeting in April of 1927; but in a

prior affidavit de Caplane set out the draft statement of his report to the board which seems to be entirely consistent with the minutes as they appear on the corporate records.

Chopy died in 1932, and his Class A stock was subsequently acquired by Gaillochet, and voted by him in favor of the alleged amendment passed on at the stockholders' meeting in May of .1938. The complainant purchased his stock from de Caplane, who has filed four affidavits in this case, but none of them state the precise time, place or manner of any such alleged agreements; nor are the allegations of the bill any more specific. It appears from these affidavits that de Caplane first conceived the idea of creating the Class A shares of Franco Wyoming Oil Company while in New York in March of 1927, and that when he returned to Paris late in March or early in April of that year he communicated that plan and its purpose to Chopy before he submitted it to the board, and that Chopy assented to it. de Caplane further states in these affidavits that when Gaillochet returned to Paris he was likewise advised of the plan and approved it.

It appears that the original minutes of the April, 1927, meeting had been previously prepared by the New York attorney for the Oil Company, and ·sent to de Caplane in Paris. They were revised and changed by him after he received them, but there is nothing in them, nor in his report to the corporate board to indicate that the special rights given the Class A stock were intended to be irrevocable; and the affidavits of the other surviving directors of the corporation do not agree with de Caplane's statement that the minutes do not correctly reflect what took place at the April, 1927, meeting; nor is it claimed that any such alleged agreement was ever submitted to the stockholders of the corporation.

In both his sworn answer and in his affidavit, Gaillochet denies that the oral agreements relied on by the complainant were ever made by him with de .Caplane and

Chopy, and it is not denied that when the creation of the Class A stock was being discussed, and at the time of the board meeting of April 7th, 1927, and for some ten days thereafter, Gaillochet was in Tunis, Africa.

Because of the contractual nature of a corporate charter, special rights and attributes of the stock issue, pursuant to its provisions, can only be given and defined by that instrument as originally drawn or subsequently amended, pursuant to the method provided for by statute.

As I have already indicated, *Section* 26 of the *General Corporation Law*, as amended, relating to charter amendments affecting "special rights of the shares" merely requires a majority vote of each class of stock outstanding at the time of the amendment.

*Section* 5, sub-par. 11 of the same Act (*Section* 2037 *Revised Code*, 1935) further provides, however:

"The Certificate of Incorporation may also contain provisions requiring for any corporate action the vote of a larger proportion of the stock or any class thereof than is required by this Chapter."

*Sellers v. Bancroft & Sons Co.*, 23 *Del. Ch.* 13, 2 *A.* 2d 108, involved the application of this section, but it is not contended that the rights given by it were exercised by the insertion of any special provisions requiring any particular vote to amend when the charter of the Oil Company was amended in 1927.

At the most, the alleged agreement between de Caplane, Chopy and Gaillochet, the holders of the whole of the 5000 shares of the Class A stock, issued by the corporation, was a mere collateral, oral agreement, not appearing in the charter of the corporation, and, therefore, not binding on it, or its stockholders. *Standard Scale & Supply Corp. v. Chappel*, 16 *Del. Ch.* 331, 141 *A.* 191; *Gaskill v. Gladys Belle Oil Co.*, 16 *Del. Ch.* 289, 146 *A.* 337; *Brooks v. State*, 3 *Boyce* (26 *Del.*) 1, 79 *A.* 790, 51 *L. R. A.* (*N. S.*), 1126, *Ann. Cas.* 1915A, 1133; *Hodgman v. Atlantic Refining Co.*, (*D. C.*) 2 *F.* 2d. 893.

Independent of any other questions under the facts of this case, a different conclusion with respect to the affect of any alleged agreement on the provisions of the charter of the Franco Wyoming Oil Company would violate the parol evidence rule.

The bill alleges that there was a definite agreement between de Caplane, Chopy and Gaillochet that no one should be elected a director of the Franco Wyoming Oil Company who was not satisfactory to de Caplane, and "that this should be a permanent and irrevocable right for the protection of them, their heirs and assigns"; and the complainant claims that, as an assignee of de Caplane's stock, he can take advantage of that agreement.

Gaillochet now owns 3000 shares of the Class A stock, and the complainant, also, claims that if the agreement relied on by him was, in fact, made between de Caplane, Chopy and Gaillochet in 1927, "to restrain him (Gaillochet) from voting that stock in favor of the amendment in no way affects the strict legal right to amend a charter of a corporation; it merely prevents a person from violating an agreement made with others when the arrangement no longer suits his purpose."

The defendants, among other things, contend, however, that that part of the alleged contract, relating to de Caplane's rights, and making them irrevocable, is not a stockholders' agreement to use voting rights in a certain way, or to accomplish a particular purpose, as is claimed by the complainant (5 *Fletcher on Corp.*, § 2064; 13 *Fletcher on Corp.*, § 5768) ; but is an attempt by a mere parol agreement to give the Class A stock certain permanent rights and incidents that are not provided for by the charter, and are wholly inconsistent with the statutory provisions read into it and composing a part of it and, therefore, void. There is force in that contention, but, in any aspect of the case, if the complainant has any contract rights against Gaillochet under the facts he should be remitted to his

action at law and the drastic remedy by injunction should not be invoked. To enjoin the voting of Gaillochet's stock would, in effect, direct the specific performance of the alleged contract; and a court of equity will not compel specific performance unless the making of a contract relied on has been clearly established by the proof.

In *Connaway v. Wright's Adm'r.*, 5 *Del. Ch.* 472, the court said:

"A complainant seeking the specific performance of a contract is bound to establish clearly and satisfactorily the existence of the contract, and its terms. If certainty in the proof be wanting, or if the testimony be contradictory or doubtful, a decree for specific performance will be refused."

See, also, *Lord Walpole v. Lord Oxford*, 3 *Ves. Ch.* 402; *Fry on Spec. Perf.*, (*6th Ed.*) § 380.

In one of his affidavits, de Caplane states:

"* * * the said Class 'A' shares were issued and held by Messrs. Chopy, Gaillochet and myself, with the express understanding among us inuring to the benefit of ourselves and assigns, that no one of the three of us, partners in this holding, would vote his shares against the other or at any time destroy the rights vested in us by the company."

On the other hand, Gaillochet, in his affidavit, in part says:

"I state in fact categorically that no such agreement was made by me at or before or in connection with the creation of the Class A shares * * *.

"No agreement of any kind on the subject of the Class A shares subsisted between Mr. de Caplane and myself until on or about May 26th, 1936."

His answer contains an equally specific denial of the allegations of the bill.

It, also, appears from the affidavits filed by the defendants that there was an agreement in writing between the de Caplanes and the Gaillochets, but it was not made until May 27th, 1936, or many years after the Class A shares had been issued, and, also, after the death of Chopy. That agreement was in the French language, and is set out in

full in the affidavit of Henri Louis Gaillochet. Translated in English, it is as follows:

"Paris, May 27, 1936.

"M. Henri Gaillochet
"M. Louis Gaillochet
"M. Roger Gaillochet
"9 Boulevard de la Madeleine, Paris.

"Dear Sirs:

"At a meeting which took place yesterday, it was agreed between us, very cordially, that you or your two sons will not vote your Class 'A' shares of Franco Wyoming Oil Company against me or my two sons, and that my sons, as owners of Class 'A' shares, likewise will not vote against you or your sons.

"Please believe, dear friends, in my kindest feelings.

"[Signed]  P. E. de Caplane
"F. de Caplane,
"Henri de Caplane."

Prior to that time, de Caplane had assigned his stock in the Oil Company to his sons.

It appears from the affidavit of Gaillochet that in the fall of 1937 he learned that de Caplane had transferred his Class A shares to the complainant, and then caused his sons to inquire of de Caplane whether Aldridge had been advised of the written agreement of May 27th, 1936. The affidavit of Louis E. Gaillochet, one of the sons, states that in response to such inquiry de Caplane said that Aldridge, the complainant, had not been told of it, and that a straight sale had been made without any obligations or restrictions, whatever. This statement is not denied in the reply affidavits of either de Caplane or the complainant. In his affidavit of October 15th, 1938, de Caplane says that Gaillochet failed to insist that he be re-elected a director of Franco Wyoming Oil Company at the next annual meeting after the letter of May 27th, 1936, and that he regarded the contractual relation between them at an end because of Gaillochet's alleged breach of his contract with him.

The agreement between the complainant and de Caplane, relating to the transfer of the Class A shares, now owned by the complainant, was in writing, and is in his possession, but no copy of it is attached to any of the affidavits submitted by him.

So long as de Caplane, Chopy and Gaillochet continued to hold the Class A stock and acted together, they could prevent an amendment of the charter of the Oil Company, striking out the 40% clause giving veto powers over the election of directors. That was the practical result of the insertion of that clause in the charter, but, regardless of the legal effect of the alleged prior oral agreement, the circumstances would seem to sustain the statement of Gaillochet that no such contract was ever intended, or in fact made.

It is reasonable to draw the conclusion that any discussion prior to the approval of the proposed amendment by the appropriate corporate action was merely intended to relate to the insertion of proper provisions in the charter of the corporation protecting the interests of those who suggested the scheme, so far as that was legally possible.

In *Lord Walpole v. Lord Oxford,* 3 *Veasey's Chancery* 402, *supra,* in which the complainant sought to have an alleged agreement to make mutual wills specifically performed, the court, in part, said:

"But for this court to execute an agreement, it is always necessary that the terms should be clear. Here it is uncertain whether they mean to amount to a legal obligation."

In addition to the facts already stated, many other circumstances of more or less importance appear in the affidavits filed by both the complainant and the defendants, which I will not consider in detail. But after considering all the facts appearing in them, I am not satisfied that they clearly show that the alleged contract of 1927 between de Caplane, Chopy and Gaillochet was, in fact, ever made. The 3000 shares of Class A stock of the Franco Wyoming Oil

Company owned by Gaillochet were therefore legally voted in favor of the charter amendment questioned by the complainant. In reaching that conclusion I have not found it necessary to consider the affidavit of Mr. Siegel, the American general counsel of the Franco Wyoming Oil Company, and one of the attorneys of record, or the contention of the solicitor for the complainant that, because of Siegel's connections with the case, his affidavit was not admissible; nor have I found it necessary to consider the contention made by one of the solicitors for the defendants that the 40% clause in the charter of the Franco Wyoming Oil Company is in conflict with *Section* 13 of the *General Corporation Law, Rev. Code* 1935, § 2045, and, therefore, void.

The Franco Wyoming Securities Corporation, the remaining defendant, is a corporation of this State, and was organized in 1930. On May 17th, 1938, about 90% of the common stock of the Franco Wyoming Oil Company was registered in the name of that corporation, and at the stockholders' meeting held on that date a large percentage of that stock was voted in favor of the amendment to the certificate of incorporation of the Franco Wyoming Oil Company, striking out the provision for the issuance of the Class A stock and the 40% clause relating thereto. The complainant contends, however, that the Securities Corporation had no right to vote that stock in favor of that amendment because it was transferred to it pursuant to the terms of a voting trust agreement, which was contrary to public policy, and, therefore, void.

The certificate of incorporation of the Franco Wyoming Securities Corporation states that the nature of its business and the objects to be promoted and carried on are:

"To subscribe or cause to be subscribed for and to purchase and otherwise acquire, hold, sell, assign, transfer, mortgage, pledge, exchange, distribute and otherwise dispose of the whole or any part of the shares of the capital stock of any other corporation or corporations, association or associations engaged in any business of the kind herein provided for now or hereinafter existing and whether created by the laws of the State of Delaware or of any other

state, territory or government, and while the owner of said shares of capital stock to exercise all the rights, powers and privileges, of ownership thereof of every kind and description, including the right to vote thereon, with the power to designate some person or persons for that purpose from time to time to the same extent as natural persons might or could do, and to issue in respect thereof, either in its own name or in the joint names of itself and any such other corporation or association, respectively, bearer certificates evidencing such rights in the holders thereof in and to the whole or any part of such shares of capital stock as this corporation may desire to accord, reserve or convey to the holders of such bearer certificates and to enter into any arrangement, contract, agreement or understanding with any such other corporation or association, respectively, with respect to the purchase or other acquisition of such shares of capital stock, the issuance of such bearer certificates in respect thereof and the rights to be accorded, reserved or conveyed to the holders thereof by this Corporation."

Since its organization, substantially all of the stockholders of the Franco Wyoming Oil Company have been residents of France, and of that nationality. By the custom prevalent in that country, and on the European continent generally, only bearer shares of stock are available for delivery in ordinary stock trading, and corporations having similar powers and duties to those given the Franco Wyoming Securities Corporation by its charter are not unusual.

Prior to 1930, most of the shares of the Franco Wyoming Oil Company were registered in the name of The Trust Francais des Actions de la Franco Wyoming Oil Company, a French corporation, having similar powers to those enjoyed by the Franco Wyoming Securities Corporation. In or about that year, the French government undertook to impose a tax on the dividends received by the Trust Francais from the shares of stock of Franco Wyoming Oil Company, registered in its name, so that the holders of the bearer certificates issued by it would only receive those dividends, after the deduction of the French tax. The Franco Wyoming Securities Corporation was organized in this State largely to avoid the payment of that tax; and pursuant to the powers given by its charter it made a contract with Franco Wyoming Oil Company setting forth the terms on which it would be willing to issue bearer certificates for such stock

of that corporation as might be transferred to it and registered in its name. Under the terms of that contract, it was agreed that, as and when dividends were received by the Securities Corporation on the stock of the Oil Company standing in its name, it would advertise the receipt of such dividends and pay them to the holders of the bearer certificates entitled thereto, less a small percentage to be retained by the Securities Corporation in payment of the services so rendered by it. By the express provisions of that contract, any holder of a bearer certificate might at any time, upon demand, surrender it, and receive a certificate of stock of Franco Wyoming Oil Company, duly registered in his name on the books of that corporation. Whenever meetings of stockholders of Franco Wyoming Oil Company were to be held, it was agreed that notice of such meetings would be advertised in certain French newspapers. The holder of a bearer certificate, without surrendering the same, was, also, entitled, on request, to a proxy signed by Franco Wyoming Securities Corporation as the registered holder of the number of shares called for in such certificate, and entitling the bearer to vote at any stockholders' meeting of the Franco Wyoming Oil Company. It was agreed that such proxy would be drawn in blank so that the holder could fill in the name of any person he might choose to represent him at such stockholders' meeting. The provisions of this contract between the Franco Wyoming Oil Company and Franco Wyoming Securities Corporation are printed on and made a part of each bearer certificate issued by the Securities Corporation. This contract could be terminated at any time by the Oil Company on six months' notice to the Securities Corporation.

The certificates previously issued by Trust Francias had likewise provided that the holder thereof might at any time surrender them and obtain a certificate of stock registered in his name.

Doubtless, prompted by their desire to avoid the French tax, in most cases the holders of those old bearer certificates surrendered them of their own accord to Franco Wyoming Securities Corporation, with instructions that they be surrendered to Trust Francais; that the certificates of stock represented thereby be registered in the name of Franco Wyoming Securities Corporation; and that bearer certificates be issued therefor, pursuant to the provisions of the contract above referred to.

Perhaps, because the fact was generally known that the Securities Corporation, like its predecessor, the Trust Francais, would regularly vote the shares deposited with it for a continuance of the existing management, the right of the holders of the bearer certificates to obtain proxies to vote the stock in the Oil Company, of which they were the equitable owners, was seldom exercised.

Parties to an alleged voting trust agreement, or outside stockholders, if injured thereby, may ordinarily attack the validity of such an agreement (5 *Fletch. on Corp.*, (*Per. Ed.*) § 2086) ; and the right of the complainant to attack the agreement, under which the stock of the Franco Wyoming Oil Company was transferred to the Securities Corporation, is not denied.

*Section* 18 of the *General Corporation Law, Rev. Code,* 1935, § 2050, provides that one or more stockholders of a corporation may "by agreement in writing * * * transfer capital stock to any person * * * or corporation * * * authorized to act as trustee, for the purpose of vesting in said person or * * * corporation * * * who may be designated Voting Trustee * * * the right to vote thereon for any period of time determined by such agreement, not exceeding ten years, upon the terms and conditions stated in such agreement." This statute both defines the public policy of the State, with respect to voting

trust agreements, and the limitations on that policy. See 5 *Fletch. on Corp., (Per. Ed.)* 285; *Perry v. Missouri-Kansas Pipe Line Co.,* 22 *Del. Ch.* 33, 191 *A.* 823.

In *Peyton v. Peyton Corporation,* 21 *Del. Ch.* 299, 194 *A.* 106, 111, the Chancellor said:

"A voting trust as commonly understood is a device whereby two or more persons owning stock with voting powers, divorce the voting rights thereof from the ownership, retaining to all intents and purposes the latter in themselves and transferring the former to trustees in whom the voting rights of all the depositors in the trust are pooled."

In the *Matter of Morse,* 247 *N. Y.* 290, 160 *N. E.* 374, the definition is practically the same except it emphasizes the implication in *Peyton v. Peyton Corporation, supra,* that the voting rights given are intended to be irrevocable for a definite period. This does not mean that all trusts of corporate stock which, either expressly or by implication, give voting rights thereto to the trustee, are voting trusts, but a trust of that nature is "ordinarily created by a transfer of shares in a corporation by shareholders to trustees to hold and vote on them for a specified period in order to secure a certain line of corporate action." 5 *Fletch. on Corp., (Perm. Ed.)* § 2075, *note,* quoting from Webster's Dictionary; see, also, *Ohio & M. Ry. Co. v. State,* 49 *Ohio St.* 668, 32 *N. E.* 633. *Peyton v. Peyton Corporation, supra,* was reversed by the Supreme Court, 22 *Del. Ch.* 322, 7 *A. 2d* 737, but on entirely different grounds. Subject to the time limitation therein provided for, the above definitions are consistent, with a fair and reasonable construction of *Section* 18 of the *General Corporation Law.* Under its provisions, the transfer of capital stock to a voting trustee is "for the purpose of vesting" in him "the right to vote thereon for any period of time determined by such agreement, not exceeding ten years"; and in the same sentence it, also, adds "upon the terms and conditions stated in such agreement." Measured by these principles, whether a particular agreement constitutes a voting trust, and, therefore, what its real purpose

and intent is must ordinarily be ascertained from the provisions of that instrument, when read as a whole, and the rights and powers given thereby. 5 *Fletch. on Corp.*, 302.

As I have already pointed out, the affidavits filed show that the agreement between Franco Wyoming Oil Company and the Securities Corporation, the material terms of which are printed on each bearer certificate issued by the Securities Corporation to the Oil Company stockholders, transferring securities to it, provides:

1. That the holder of such certificate may, at any time, and without prior notice, surrender it to the Securities Corporation and secure in lieu thereof a stock certificate, issued by the Franco Wyoming Oil Company, and registered in his name.

2. That, even without surrendering his bearer certificate, the holder of it may, on request, procure from the Securities Corporation a blank proxy enabling him, or his nominee, to vote the stock represented by it, as he may see fit, at any meeting of the stockholders of the Oil Company.

Complete liberty of action, at all times, on the part of the real owner of such stock is, therefore, assured. Whether, or not, the clear rights reserved by him are ordinarily exercised or neglected, the stock so transferred to the Securities Corporation is not held under a trust agreement, merely giving irrevocable voting rights to that corporation for a specified period, and such agreement is not a voting trust within the fair meaning of that term. See *Ohio & M. Ry. Co., v. State*, 49 *Ohio St.* 668, 32 *N. E.* 633, *supra; Kreissl v. Distilling Co., of Amer., et al.*, 61 *N. J. Eq.* 5, 47 *A.* 471. The transfers of stock to that corporation under such an agreement were, therefore, legal and valid.

It appears that, with respect to the shares of stock so transferred to Franco Wyoming Securities Corporation, its certificate of incorporation gives it the right "to exercise all the rights, powers and privileges of ownership thereof,

of every kind and description, including the right to vote thereon, with the power to designate some person, or persons, for that purpose, from time to time, to the same·extent as natural persons might or could do   *   *   *.''

With certain exceptions, which we need not consider, *Section* 1 of the *General Corporation Law, Rev. Code* 1935, § 2033,· provides, in part:

"Any number of persons, not less than three, may associate to establish a corporation for the transaction of any lawful business, or to promote or conduct any legitimate objects or purposes under the provisions of and subject to the requirements of this Chapter as hereinafter provided   *   *   *.''

*Section* 78 of the same act, *Rev. Code* 1935, § 2110, also, provides:

"Any corporation organized under the laws of this State, whether created by this Chapter, special Act of Legislature or general law, may guarantee, purchase, hold, sell, assign, transfer, mortgage, pledge or otherwise dispose of, the shares of the capital stock of, or any bonds, securities or evidence of indebtedness created by any other corporation or corporations of this State or any other State, country, nation or government, and while owner of said stock may exercise all the rights, powers and privileges of ownership including the right to vote thereon."

The complainant claims, however, that *Section* 78 merely relates to an absolute and unqualified ownership of stock, and not to a mere special and legal interest, such as that held by the Franco Wyoming Securities Corporation, as assignee; but that construction is not justified by the language used.

Under the provisions of that section any corporation, organized under the laws of this State, may "guarantee, purchase, hold, sell, assign," etc., shares of the capital stock of any other corporation of this State, or any other State. While "owner of such stock it may exercise all the right to vote thereon." The words "hold" and "owner" are ordinarily words of similar broad import and that general meaning is not changed by the context of the statute. Neither the words preceding nor following the word "hold" would have that effect.

As was aptly pointed out in 50 *Corpus Juris* 778,

"Ownership may be absolute or conditional or, stated otherwise, it may be absolute, or it may be limited and qualified; * * *. Too, ownership may be * * * special * * * general and special, legal or equitable, legal and nominal, or equitable and beneficial, * * *. There may be two distinct properties held by several persons in the same thing, or the ownership or legal title may be in one person, and the right of possession in another * * *."

The charter provisions of the Franco Wyoming Securities Corporation in question were, therefore, valid; and if the equitable owners of the stock of the Franco Wyoming Oil Company, standing in the name of the Securities Corporation on the books of the Oil Company, failed to exercise their rights to secure proxies to vote on that stock, the Securities Corporation had the power to exercise voting rights thereon at the stockholders' meeting in May of 1938. My conclusion, therefore, is that the charter amendment proposed at that meeting received more than a majority vote of both the Class A and outstanding common stock of the Franco Wyoming Oil Company and was legally adopted. Perhaps I should also state that while the complainant questions the validity of the newspaper notices of the stockholders' meeting of May 17, 1938, none of his affidavits deny that legal notice was given to all of the registered owners of stock of the Oil Company.

The complainant's motion for a preliminary injunction must be refused, and the restraining order dissolved.

Let an order be prepared in accordance with this opinion.

Note. Affirmed on appeal to Supreme Court. See *post p.* 349, 14 *A.* 2d 421.