Complainants are holders of shares of 7% cumulative preferred stock issued by the defendant under authority of an amendment to its charter adopted June 29, 1926.
Said stock has a par value of one hundred dollars per share; calls for an annual seven dollar per share dividend which is cumulative and must be paid before any dividends may be paid to the common stock; is entitled to receive in case of involuntary liquidation of the company or its voluntary dissolution one hundred dollars per share and an amount equal to all unpaid cumulated dividends plus a premium of ten dollars per share; is redeemable at one hundred and ten dollars per share plus an amount equal to the unpaid dividends cumulated thereon; has the benefit of a sinking fund for its retirement; and is entitled to the right to elect one less than a majority of the board of directors in case the corporation defaults in the payment of the stipulated dividends for four successive or six non-successive quarterly periods. The preferred stock has certain other protective rights in relation to the creation of indebtedness, the issuance of additional shares of its own class and the creation of any new class outranking it in priority of preferences.
On the creation of the preferred stock in 1926, the only other stock outstanding was an issue of common stock, which is now the only stock entitled to vote except as the preferred stock may vote in certain instances.
The designation, preferences, rights, privileges and voting powers of the preferred stock are set forth in Article III of the certificate of incorporation as amended on June 29, 1926. Paragraph 7 of said article is of such importance to the issue presented by the demurrer as to warrant its quotation in full. It is as follows:
"7. So long as any Preferred Stock shall remain outstanding, then without the affirmative vote or written consent of the holders of 75% of the shares of Preferred Stock at the time outstanding, the designations, preferences and voting powers of the Preferred Stock, and the restrictions or qualifications thereof, shall not be changed or altered; provided, however, that the par value, dividend rate and redemption price of the Preferred Stock, and the amount payable to the holders thereof in the event of the voluntary or involuntary liquidation, dissolution, or winding up of the corporation, shall not be reduced without the affirmative vote or written consent of the holders of one hundred per cent (100%) of *Page 110 
the shares of Preferred Stock at the time outstanding.
This paragraph of the amended charter was attempted to be altered by the stockholders by an amendment purporting to have been adopted in accordance with the statutory procedure provided for in Section 26 of the General Corporation Law under which the corporation exists. Revised Code 1935, § 2058. The complainants challenge the legality of the purported amendment.
The challenged amendment was assumed to have been adopted on December 11, 1936. It retained paragraph 7 of Article III in its entirety as originally written except in two important particulars. These particulars consisted in this — the figure of seventy-five per cent. was changed to sixty per cent. and the figure one hundred per cent. was changed to sixty-five per cent. The result was, if the amendment was lawfully operative, that whereas before its alleged adoption the consent or affirmative vote of seventy-five per cent. of the preferred stockholders was necessary for the corporation to be able to change or alter the designations, preferences, voting powers, restrictions or qualifications of the preferred stock, and one hundred per cent. to reduce the par value, dividend rate and redemption price thereof, after the amendment the required percentages of the preferred stock's consent or vote in order to legalize those changes were sixty per cent. and sixty-five per cent. respectively.
At the meeting of stockholders in December, 1936, when the proposed amendment was acted upon, only fifty-five per cent. of the outstanding preferred stock voted in favor of the amendment and thirty per cent. thereof voted in opposition. The complainants contend that the amendment was incapable of lawful adoption unless seventy-five per cent. of the preferred stock voted favorably with respect to the matters to which that percentage of vote was applicable, viz., the change or alteration of "the designations, preferences and voting powers of the preferred stock," and one hundred per cent. of preferred stock voted favorably with respect to the matters to which it was applicable, viz., the reduction of the "par value, dividend rate and redemption price of the preferred stock and the amount payable to the holders thereof in the event of voluntary or involuntary liquidation, etc." As the amendment did not receive the favorable vote of those percentages, the complainants assert the amendment was never legally adopted.
The defendant contends that the specified percentages of favorable votes of the preferred stockholders were not required as a condition of the amendment's lawful adoption. It contends that only a majority vote of the preferred stock was necessary, and that therefore the amendment was lawfully adopted.
After the alleged adoption of the amendment of December 11, 1936, viz., on August 1, 1937, the defendant sent to its stockholders notice of a plan for the readjustment of its capital structure which it proposed should be effectuated through an amendment to its certificate of incorporation. Unpaid dividends were then accumulated on the preferred stock since October 31, 1931. The proposed amendment, if adopted, would alter very substantially the rights of the existing preferred stock in numerous particulars. It would reduce the dividend rate from seven per cent. to five per cent., the dividends would accumulate only in case they had been earned but not paid in any year, the redemption price and the amount due on each share in case of liquidation were reduced, and the contingencies on which the preferred stock could elect one less than a majority of the board of directors would be more exacting than before. The proposed amendment also created new classes of stock which need not now be described, and provides a non-mandatory method of capitalizing the preferred dividend in arrearages.
The company invited written consents of the preferred stockholders to the proposed amendment and later called a special meeting of its stockholders to act thereon. Said meeting was held on November 10, 1937. The proposed amendment is claimed to have received the favorable votes of 20,595 shares of the preferred stock, which is about seventy-two per cent. of the total preferred stock then outstanding, exclusive of what was held in the treasury of the company.
[1] Among the shares voted in the affirmative there were 1,159 shares which were accepted as voted by the two executors of Joseph Bancroft. The bill alleges, however, that one executor voted affirmatively and the other negatively. That being so, I do not see by what principle those shares should have been counted as voting in the affirmative. If counted at all, they might with equal reason have been counted in the *Page 111 
negative. The voice of one executor was entitled to as much weight as was that of the other. It was not the function of the judges of the election to interject themselves momentarily into the executorship and assume to resolve its internal differences.
But the matter of the voting of these 1,- 159 shares does not appear to be of any decisive moment, for without them there still remained enough favorable votes of preferred stock to satisfy the sixty per cent. and sixty-five per cent. requirements if those percentages were the governing ones.
So the question comes back to whether the amendment to the charter of December, 1936, setting up the sixty per cent. and sixty-five per cent. percentages was lawfully adopted. If it was, the amendment of 1937 received the necessary preferred stock vote specified by the amended charter and the only question then would be whether the readjustment of capital was such as would be otherwise valid under the law, statutory and constitutional.
If the amendment of 1936 was invalid because of a lack of necessary preferred stock votes, as claimed by the complainants, and the complainants are in position to rely on such alleged invalidity, then the amendment of 1937, by which the capital structure was readjusted, was not lawfully adopted and the demurrer should of course be overruled.
[2] The defendant contends that even if the amendment of 1936 was not lawfully adopted because of the insufficiency of preferred stock votes in its favor, the complainants were too late when their bill was filed on November 11, 1937, to complain against it. In other words the complainants are said to be barred by laches against objecting to the 1936 amendment. I do not think so. I cannot see that the complainants were under any duty to institute suit to declare the amendment void until events, actual or threatened, revealed that proceedings under the amendment were to be taken which would be prejudicial to their claimed rights. Non constant, any future proposed alteration of the charter might never be introduced which would necessitate an assertion of those rights, or, if so, the vote of the preferred stockholders might be sufficient to satisfy the requirements of paragraph seven of Article III as the same existed prior to the attempted change in it in December, 1936. When on November 10, 1937, the alterations before referred to were declared to have been adopted by the vote as stated above, the complainants were put on notice that the amendment of 1936 was proposed to be applied in a threatened derogation of the rights which they claimed adhered to the preferred stock which they held. They immediately, viz., on the next day, November 11, 1937, filed the pending bill. In the interval between December 11, 1936, when the voting percentages were changed by the challenged amendment of that date and November 10, 1937, when the amendment readjusting the capital structure was purported to have been adopted, no intervening equities had arisen. I do not think the delay after December 11, 1936 of not quite a year in filing their bill can be charged against the complainants as amounting to laches under the circumstances.
I now recur to the principal question of law. Did the amendment of December, 1936, receive the necessary votes of preferred stockholders to validate its adoption?
The defendant contends that the affirmative vote of a mere majority of the preferred shares was all that was necessary to the amendment's adoption. As to all those matters which are the subject of amendment but not within the description of the subjects covered by the seventy-five per cent. and one hundred per cent. provisions, this contention I suppose would be conceded by the complainants. But even as to the subject matters to which the percentages of seventy-five and one hundred applied, the defendant contends also that an amendment reducing those percentages to sixty and seventy-five respectively needed only a bare majority vote for its acceptance.
If this be true, it is plainly apparent that the protection afforded to the preferred stock by the percentages referred to becomes no protection at all, for notwithstanding a bare majority vote could not disturb the rights which before December, 1936, could not be altered or changed except by the approval of seventy-five per cent. and one hundred per cent. respectively of the preferred stock so long as those percentage provisions remained, it was always possible, if the defendant's contention is sound, for a bare majority to eliminate those percentages entirely by appropriate amendment and then by subsequent proceedings to proceed by a like bare majority to alter and change the provisions of the charter which theretofore were exempt from alteration except by majorities equalling at least the theretofore stipulated percentages. *Page 112 
The corporation did not go to the full length of what the principle contended for by the defendant would allow. It did not eliminate the percentages entirely. It simply reduced them. It took two steps to arrive at the result ultimately desired, viz., the alteration of the rights of the preferred stock by less than the then specified percentages of votes, in particulars to which both percentages respectively applied. It first cut down the percentages by a majority vote less than that specified and then mustered enough votes to comply with the new percentages, but less than enough to comply with the old, to deprive the preferred stock of the rights which were supposed to be safeguarded by the larger percentage figure.
[3] Now it must strike the impartial mind that that sort of thing is quite contrary to the evident purpose of the percentage provisions. If it be permissible, the protection to the preferred stockholders who invested their money on the faith of those percentage safeguards, was utterly illusory. If the protection which they once had can be thus taken from them, the power to do so ought to be clearly manifest.
What is the argument by which the defendant seeks to demonstrate that such power exists?
[4] It is said that the amendment of 1936 did not deal with "the designations, preferences, and voting powers" of the preferred stock, and therefore touched none of the subjects as to which a seventy-five per cent. majority of the preferred stock was required. It may be conceded that the amendment did not deal with either designations or preferences. Why did it not deal with "voting powers"? The defendant answers that voting powers are attached to individual shares of stock and that such is the meaning of the phrase as used in paragraph seven of Article III of the charter. If so, the argument goes, the "voting powers" were not disturbed by the 1936 amendment because each share of the preferred stock still has the right to vote after the amendment as well as before. It appears to me, however, that the seventy-five per cent. provision deals not with voting powers in terms of individual shares. It is an incongruity to speak of a seventy-five per cent. majority as associated with an individual share out of thousands. The provision can apply only in reference to all the stock of the specified class considered as a group. Maddock et al. v. Vorclone Corp., 17 Del.Ch. 39, 147 A. 255, cited by the defendant, which spoke of the right to cumulative voting as individual and not belonging to a minority as a class is clearly distinguishable and not in point. Looking at the preferred stock as a group, the seventy-five per cent. provision conferred upon it important voting rights. These rights could be described as either affirmative or negative in character. If seventy-five per cent. of the shares voted affirmatively, the proposal was adopted; if the affirmative lacked only one share to compose the seventy-five per cent., then, even though not one of the remaining shares voted, the result would be just as though they had all voted negatively. Silence would be in every essential respect a negative vote. The "voting powers" protected by the seventy-five per cent. provision attached to the group qua group.
[5] The statute in Section 26, Revised Code 1935, § 2058, provides that if a proposed amendment would "alter or change the preferences, special rights or powers given to any one or more classes of stock * * * so as to affect such class or classes of stock adversely * * * then the holders of the stock of each class of stock so affected by the amendment shall be entitled to vote as a class upon such amendment, whether by the terms of the Certificate of Incorporation such class be entitled to vote or not; and the affirmative vote of a majority in interest of each such class of stock * * * shall be necessary to the adoption thereof." The statute, therefore, recognizes the rights of stock as a class in matters of change and amendment of its preferences, special rights and powers, and segregates such classes into separate voting groups. I conceive the preferred stock of this corporation was set apart as a voting group by the charter and as a group possessed "voting rights."
When the class of stock is thus segregated into a voting group, the statute in Section 26 prescribes the rule of majority voting for the ascertainment of the group judgment. But Section 5, subparagraph 11 of the statute, Revised Code 1935, § 2037, subpar. 11, provides that the certificate of incorporation may require for any corporate action the vote of a larger proportion of the stock or any class thereof than is required by any other provisions of the act.
[6] Therefore in the case of the particular corporation now before the court, *Page 113 
the majority rule of Section 26 is supplanted by the seventy-five per cent. and one hundred per cent. rules when the preferred stock class to be affected by a proposed amendment is called upon to vote with respect to matters adversely affecting the specified rights to which those percentages are applicable.
[7] The certificate of incorporation of the defendant contains an article reserving power to the corporation to effect amendments of the certificate in the future as may now or hereafter be prescribed by statute and providing specifically that all rights of stockholders are subject to this reservation. The exercise of this reserved power is of course to be according to the terms and procedure of the statute. Solicitors for the defendant speak of this reserved power of amendment as the statutory method of amendment, which prescribes only a majority stock vote to validate the amendatory action. At the same time, they speak, as if in contradistinction, of an amendment requiring more than a majority vote by virtue of a charter provision, as a process of self amendment. Since the statute ranks higher in gradation of authority than the charter, then it must follow, say the solicitors for the defendant, that if the statute prescribes that a mere majority vote shall validate a proposed amendment, a provision in the charter that more than a mere majority shall be required, seventy-five per cent. for instance, the so-called self-amendment by the charter rule must succumb to the majority rule of the statute under the doctrine of Gaskill v. Gladys Belle Oil Co., 16 Del.Ch. 289, 146 A. 337. The trouble I find with this argument is that the supposed distinction between amendments by statutory method and amendments by charter created methods, on which it is founded, does not exist. There is no conflict here in the matter of amendments between the statute and the charter. A proposed amendment must in any case conform to the procedure and requirements of the statute. The so-called statutory method of amendment in this particular case, by the very terms of the statute, demands an affirmative vote of not less than seventy-five per cent. of the preferred stock in some connections and not less than unanimity in others. This is because of Section 5 (subpar. 11) above referred to, which makes the charter percentage the statutory one in lieu of the statute's general rule of a bare majority.
2 A.2d — 8
Furthermore it is to be observed that the article of the certificate of incorporation reserving a power to amend as fully as the statute permits, specifically provides in its concluding clause that the power shall be "subject, however, to the provisions of Article III hereof," said article being the one in paragraph seven thereof which contains the percentages herein frequently mentioned. Thus the certificate of incorporation itself by express stipulation makes doubly sure what would otherwise be true even without the proviso (because of Section 5, subpar. 11, before referred to) viz., that the majority rule of the statute is supplanted by the percentage rules of the charter.
I conclude under this head of the discussion that the amendment of December, 1936, altered the voting rights of the preferred stock and failed to receive the prescribed vote of seventy-five per cent. of the outstanding preferred stock in its favor. It is therefore void as against the complainants who never expressed their assent to its adoption.
With respect to the dividend rate on the preferred stock, its redemption and liquidation values, it was provided in substance that before any reduction thereof could be had the affirmative vote of one hundred per cent. of the preferred stock should be obtained. The 1936 amendment did not undertake to effect any reduction in the rate of dividend of the preferred stock or in its redemption or liquidation values. Therefore the one hundred per cent. provision was not invokable on the occasion of the vote on the 1936 amendment.
If the 1936 amendment had received the assent of seventy-five per cent. or more of the preferred stock, then the question would arise of whether it was in the power of seventy-five per cent. or more through the guise of altering the "voting powers" of the preferred stock, to reduce the one hundred per cent. requirement to sixty-five per cent. in respect of an amendment which looked to a reduction in the particular matters, viz., dividend rate, etc., which were the subject of the one hundred per cent. safeguard.
As, however, the 1936 amendment received less than a seventy-five per cent. assent from the preferred stockholders, the question just suggested need not be considered.
The defendant's brief at one point argues as follows — "The view that stockholders *Page 114 
may prescribe the method of amendment and by so doing forever withdraw or deny future stockholders the exercise of the statutory power of amendment, implies that the provisions of a corporate charter may be made irrepealable. This is precisely what complainants say when they argue that par. 7 (of Article III) may be amended only by unanimous consent of the holders of all the outstanding preferred shares." Following the analogy of the principal which disables one legislative session from exempting its acts from amendment by a subsequent one, the defendant contends that one session, so to speak, of the stockholders is equally impotent to restrain amendment by a later one. The case of King v. Ligon et al., 180 S.C. 224, 185 S.E. 305, is cited in support of this contention. That case is of no aid to the defendant. It held that the original charter was subject to amendment according to the terms of the statute under which the corporation was created, and it appears from the report of the case that the assailed amendment was adopted in strict accordance with the statutory provisions. The decision in that case appears to rest on sound principle. The amendment here challenged, the one of 1936, was not adopted in conformity with the terms of the statute. This is so when it is remembered that the statute adopts as the rule of voting the rule which is prescribed by the charter, if one is prescribed, in exclusion of the statutory rule of the majority which prevails in the absence of a charter provision requiring more. In the cited case it was sought to invalidate an amendment which had been statutorily adopted. In the instant case the defendant seeks to validate an amendment which lacked the support of statutory compliance.
But the argument touching the point just noticed, is predicated on the one hundred per cent., or unanimity feature of paragraph seven of Article III of the charter. As before stated, I do not feel called upon to consider in this case anything more than the seventy-five per cent. feature in its applicability to "voting powers." When seventy-five per cent. or more of the preferred shares undertake to alter the one hundred per cent. provision, if ever, it will then be time to consider whether it is permissible for a corporation in exercising the power conferred by Section 5 (subpar. 11) to make a charter provision practically irrepealable by raising the statutory rule of the majority found in Section 26 to as high as one hundred per cent. It will also then be time to consider whether the one hundred per cent. provision is capable of reduction by a seventy-five per cent. vote. As neither the amendment of 1936 nor of 1937 received as much as a seventy-five per cent. vote, it is not necessary to consider whether with respect to some of the particulars of amendment only a one hundred per cent. vote could validate them.
 The demurrer will be overruled. *Page 133