## Wurtzel v. Park Towne Place Apartments Limited Partnership

*Marc J. Lucker,* for plaintiff.
*Ronald Shaffer,* for defendant.

HERRON, *J.,* August 11, 2001—In this individual, derivative and class action, a limited partner asks the court to preliminarily enjoin the limited partnership from merging with an entity affiliated with the general partner. The court will grant the preliminary injunction because a supermajority of the limited partners did not approve the merger as required by the limited partnership agreement. The following findings of fact, discussion and conclusions of law support the court's contemporaneously-filed order.

## FINDINGS OF FACT

### I. *The Parties*

(1) Plaintiff Alan Wurtzel has been a limited partner in defendant Park Towne Place Associates Limited Partnership since 1986. Stip. ¶1.

(2) The partnership was formed in 1985. It owns Park Towne Place, an apartment complex in Philadelphia. Stip. ¶2.

(3) The partnership sold 380 limited partnership units to investor limited partners for $75,000 to $100,000 per unit. Wurtzel bought one unit. Stip. ¶6.

(4) Defendant PTP Properties Inc. is the sole general partner of the partnership. Stip. ¶3.

(5) On February 26, 1999, PTP became a wholly owned subsidiary of defendant AIMCO Properties L.P. Stip. ¶¶3, 7; exhibit D-1; exhibit D-9.

(6) AIMCO Residential Group L.P. is the manager of the property. AIMCO controls AIMCO Residential Group. Exhibit P-14; stip. ¶7.

### II. *The Partnership Agreement*

(7) In 1986, the partnership's original general partner and its original limited partner signed a partnership agreement. Stip. ¶5; exhibit D-4.

(8) Delaware law governs the construction and enforcement of the agreement. Exhibit D-4, agreement §11.6.

(9) In 1996, the partnership amended the agreement to add a new section 5.8. Exhibits P-11 and D-D, amendment §5.8. Section 5.8(c) requires the consent of the general partner and a two-thirds interest of the limited and general partner for any action by the general partner

"[c]ausing the partnership to consolidate, merge or enter into any form of consolidation with or into any other entity or to convey, transfer or lease its assets substantially as an entirety to any person or entity except to a bona fide purchaser for cash consideration." Exhibit P-11.

### III. *The Tender Offers and Merger*

(10) In March 1999, Equity Resources Boston Fund offered to buy partnership units from the limited partners for $5,000 per unit. Around the same time, AIMCO offered $8,208 per unit. Stip. ¶8. AIMCO's offer contained the statement that the general partner believed AIMCO's price to be fair. Exhibit P-14 at S-10.

(11) In March 2000, Equity increased its offer to $12,000 per unit or $6,000 per half unit. Stip. ¶10.

(12) In May 2000, AIMCO increased its offer to $48,533. Stip. ¶11. AIMCO's offer contained the statement that the general partner believed AIMCO's price to be fair. Exhibit P-4 at 7.

(13) In February 2001, AIMCO increased its offer to $66,788 per unit. Stip. ¶12. AIMCO's offer contained the statement that the general partner believed AIMCO's price to be fair. Exhibit P-5 at 2.

(14) Some limited partners sold their partnership units to AIMCO. By May 29, 2001, AIMCO owned 58.14 percent of the limited partnership units. Stip. ¶13.

(15) On or about May 29, 2001, the partnership sent a letter and information statement to the limited partners. The letter announced that

"(a) the partnership would merge with Park Towne Place Transitory Company LLC, an entity wholly owned by AIMCO;

"(b) the merger would occur on June 29, 2001;

"(c) the partnership would be the surviving entity;

"(d) the merger would force the minority limited partners to give up their interests in exchange for $81,422 in cash or 1776 AIMCO partnership units;

"(e) AIMCO based the consideration on an appraisal of the liquidation value[1] of the partnership interests;

"(f) the purposes of the merger were to decrease the expenses associated with the minority limited partners, to provide the limited partners with liquidity for their investment, and to offer them an opportunity to swap their partnership's interest for the more diversified AIMCO interests;

"(g) because AIMCO owned 58.14 percent of the outstanding interests in the partnership, the partnership did not require the approval of the other limited partners;

"(h) limited partners who failed to make an election between cash and AIMCO units would receive cash;

"(i) appraisal rights were available, but each limited partner would have to pursue appraisal individually; and

"(j) AIMCO and PTP consented to the merger offer and believed it to be fair." Exhibit D-E; stip. ¶16.

---

1. The partnership agreement expressly authorizes disposing of the partnership units of an unwilling partner in only three ways: (1) buying the units of a limited partner who defaults on a capital contribution, (2) buying the units of a general partner who is removed, and (3) distributing assets to all partners upon the sale of all or substantially all of the partnership assets or upon any other event triggering dissolution of the partnership. Agreement §§2.5, 4.2, 5.5 and 9.3. See also, n.10, *infra*. In all three situations, the amount paid to the partner is based on the *fair market value* of the partner's interests. Nonetheless, PTP, as general partner, consented to a merger forcing the limited partners to sell their shares at *liquidation* value.

(16) The partnership did not obtain the approval of two-thirds of the partnership interests for the merger. Exhibit D-E; stip. ¶16.

(17) On June 28, 2001, Wurtzel filed this action claiming breach of fiduciary duty, breach of the partnership agreement and fraud. The proposed class consists of 194 limited partners in the partnership. Complaint ¶9.

(18) Wurtzel also petitioned for a temporary restraining order and preliminary injunction against the defendants. By order dated June 28, 2001, and entered June 29, 2001, the court granted a TRO barring the defendants from engaging in "any transaction which would limit, transfer, assign or extinguish the rights of any limited partner in [the partnership], including but not limited to the contemplated merger of [the transitory company] with and into the partnership."

## DISCUSSION

The defendants threaten to merge the partnership with the transitory company without obtaining the required consent of partners with two-thirds of the partnership interests. The merger and forced buyout of the minority limited partners would irreparably harm Wurtzel and his fellow limited partners by depriving them of their right to vote on the merger. Therefore, the court will grant the petition and preliminarily enjoin the defendants from undertaking the illegal merger or from further buying limited partners' partnership units.

### I. *Standard for Preliminary Injunction*

The court may grant the injunction if Wurtzel establishes the following elements: (1) relief is necessary to prevent immediate and irreparable harm that cannot be

compensated by damages, (2) greater injury will occur from refusing the injunction than from granting it, (3) the injunction will restore the parties to the status quo as it existed immediately before the alleged wrongful conduct, (4) the wrong is actionable and Wurtzel's right to relief is clear, and (5) the injunction is reasonably suited to abate that wrong. *School Dist. of Wilkinsburg v. Wilkinsburg Education Ass'n*, 542 Pa. 335, 338 n.2, 667 A.2d 5, 6 n.2 (1995); *New Castle Orthopedic Associates v. Burns*, 481 Pa. 460, 464, 392 A.2d 1383, 1385 (1978). These requisite elements "are cumulative, and if one element is lacking, relief may not be granted." *Norristown Municipal Waste Auth. v. West Norriton Township Municipal Auth.*, 705 A.2d 509, 512 (Pa. Commw. 1998).

## II. *Wurtzel's Right to Relief for an Actionable Wrong Is Clear*

### A. The Impending Merger Is Illegal Because Two-Thirds of the Partnership Interests Did Not Consent to the Merger

Wurtzel argues that his right to relief is clear because a supermajority of the partners did not agree to the merger. The court agrees. In 1996, the partnership amended the agreement to add a new section 5.8. Exhibits P-11 and D-D, amendment §5.8. Section 5.8(c) requires that the general partner and a two-thirds interest of the limited and general partners consent to any action by the general partner "[c]ausing the partnership to consolidate, merge or enter into any form of consolidation with or into any other entity or to convey, transfer or lease its assets substantially as an entirety to any person or entity except to a bona fide purchaser for cash consideration."

Exhibit P-11.[2] Therefore, the proposed merger requires the consent of PTP and a two-thirds[3] supermajority of the partnership interests. PTP did not get the consent of the two-thirds of the partnership interests, and a merger without that consent is illegal.

### 1. *The bona fide purchaser exception in section 5.8(c) does not apply to mergers*

The defendants' first argument is that the supermajority requirement for this merger does not apply because the merger is a sale or transfer to a bona fide purchaser for cash consideration. The court disagrees. Section 5.8(c) deals with two classes of transactions: (1) mergers and consolidations, and (2) conveyances, transfers and leases of assets. The only reasonable reading of the bona fide purchaser exception to section 5.8(c) is that the exception applies only to conveyances, transfers and leases of assets, and not to mergers and consolidations. Any other reading would make no sense: the partnership cannot

---

2. The original agreement did not expressly set forth limited partners' rights in the case of a merger of the partnership. Where a limited partnership does not address the approval of a merger, a merger requires the consent of all general partners and the consent of the limited partners with a simple majority of the interest in profits. 6 Del.C. §17-211(b).

3. The version of section 5.8 in the defendants' exhibits, which is undated and not signed by all parties, sets the voting requirement at "66__ percent:" the scrivener seems to have left a space for a fraction to be inserted at a later date. Exhibit D-D; exhibit D-5. The version of section 5.8 in Wurtzel's exhibits, which is undated but signed by all parties, sets the voting requirement as "66 2/3 percent." Petition, exhibit 1; exhibit P-11. As the defendants have admitted in a brief that 66 2/3 percent is the correct percentage, the court finds that 66 2/3 percent is the percentage that the limited partners ultimately agreed upon. Memorandum of defendants in opposition to plaintiff's petition for a preliminary injunction at 5 n.2, 7/27/01.

"consolidate, merge or enter into any form of consolidation . . . *to* a bona fide purchaser."

Even were the bona fide purchaser exception applicable to mergers, the exception could not apply here. The defendants do not identify the purchaser and the cash consideration. The AIMCO units being offered as consideration are not cash. But even assuming the Transitory Company or AIMCO is the purchaser and the $81,442 per share the cash consideration, the purchase is not bona fide. Whatever "bona fide purchaser for cash consideration" means in section 5.8, it must at least mean an outsider dealing at arms-length with the partnership and with no notice of defects in the general partner's authority.[4] AIMCO and its wholly-owned transitory company are not outsiders. AIMCO admitted in its merger information statement that it "determined the terms of the merger, including the amount of consideration to be paid to [the limited partners] in the merger, without arms-length negotiations." Exhibit D-11, information

---

4. It is difficult to shoehorn the concept of bona fide purchaser into a determination of whether the limited partners must approve a merger. A bona fide purchaser is one who has given value for property in good faith and without notice of defects in the vendor's title to the property. See *Haas v. Haas,* 119 A.2d 358, 363 (Del. Ch. 1955); see also, 6 Del.C. §3-302 (defining holder in due course) and 6 Del.C. §1-201(9) (defining buyer in the ordinary course of business). Generally, a *purchaser* invokes the bona fide purchaser doctrine to shield itself from a claim that a third party has against the vendor *after* the vendor has transferred the property to the purchaser. 6 Del.C. §2-403 (rights of good faith purchasers of goods); 6 Del.C. §3-305(b) (rights of a holder in due course); 6 Del.C. §9-320(a) (2001 revision) (rights of a buyer in the ordinary course of business). But here the *vendor, i.e.,* the general partner acting for the partnership, has invoked the bona fide purchaser exception to shield itself from claims *before* any transfer has occurred.

statement at 12. And AIMCO knew of the failure to comply with the supermajority provision.

## 2. *The defendants cannot eliminate the supermajority provision without the consent of partners holding two-thirds of the partnership interests*

The defendants' second argument is that the court should ignore the supermajority requirement because AIMCO, as the holder of the majority of the partnership interests, could simply amend the agreement to eliminate the supermajority requirement.[5] Therefore, they argue that equitable enforcement of section 5.8(c) would be fruitless. See *Virginian Ry. Co. v. System Fed'n No. 40,* 300 U.S. 515, 550 (1937) ("[A] court of equity may refuse to give any relief when it is apparent that that which it can give will not be effective or of benefit to the plaintiff."). The court disagrees. The simple response to this argument is that, even if AIMCO can amend the agreement, it has not done so. Section 5.8(c) is still effective, and the defendants must abide by it.[6] More fundamentally, the court holds that the amendment of the supermajority voting provision requires the approval of a like supermajority of the partners. With only 58 percent of the interest, AIMCO cannot eliminate a 75 percent supermajority requirement by itself.

5. The agreement provides that it can be amended in most cases by simple majority vote. This amendment procedure is a permissible deviation from the statutory default rule for limited partnership agreements, which requires a unanimous vote to amend the partnership agreement. 6 Del.C. §17-302(f).

6. The partnership adopted that requirement as a condition for obtaining financing. Exhibit D-E. The court notes that defendants' allegation that they would eliminate that provision is somewhat suspect, since revoking it might breach the financing agreement.

There seem to be no published decisions in Delaware addressing amendment of a supermajority voting provision in a limited partnership agreement. The Delaware corporation code requires a supermajority vote to amend a supermajority provision in a corporate charter. 8 Del.C. §242(b)(4).[7] Section 242(b)(4) codified a common-law rule first expressed in *Sellers v. Joseph Bancroft & Sons Co.*, 2 A.2d 108, 111-12 (Del. Ch. 1938). In *Sellers*, the corporation's charter required a 75 percent or 100 percent vote to amend certain rights of holders of preferred shares, including voting rights. The charter did not expressly require a supermajority vote to amend those rights. The company's shareholders tried to reduce the 75 percent and 100 percent requirements to 60 percent and 65 percent respectively through a charter amendment at the annual shareholders meeting. The shareholders approved the amendment by a 55 percent vote of the preferred shares. The plaintiff challenged the amendment. The defendant argued that a simple majority vote was sufficient to eliminate the supermajority provisions. The court rejected this argument as "quite contrary to the evident purpose of the percentage provisions. If it be permissible, the protection to the preferred stockholders who invested their money on the faith of those percentage safeguards, was utterly illusory." *Sellers*, 2 A.2d at 112. The court voided the amendment.

---

7. Section 242(b)(2) reads as follows:

"Whenever the certificate of incorporation shall require for action by the board of directors, by the holders of any class or series of shares or by the holders of any other securities having voting power the vote of a greater number or proportion than is required by any section of this title, the provision of the certificate of incorporation requiring such greater vote shall not be altered, amended or repealed except by such greater vote." 8 Del.C. §242(b)(4).

In *Centaur Partners IV v. National Intergroup Inc.*, 582 A.2d 923, 929 (Del. 1990), the court held that amendment of supermajority provisions in a corporation's shareholder-adopted charter and bylaws by less than a like supermajority would "completely abrogate[ ] the intention of the stockholders who adopted those provisions . . . ." [8]

The court predicts that Delaware courts would apply the *Sellers/Centaur Partners* rule to a supermajority provision in a limited partnership agreement. The obvious purpose of section 5.8 was to give the limited partners greater approval rights over certain extraordinary partnership transactions. Allowing the defendants to circumvent these clear rights by a simple majority amendment would render section 5.8 illusory. The court cannot hold that the limited partners intended to adopt a provision that, as the defendants argue, would for practical purposes be unenforceable. *Sonitrol Holding Co. v. Marceau Investissements*, 607 A.2d 1177, 1184 (Del. 1992) ("The cardinal rule of contract construction is that, where pos-

8. Along with considering the shareholders' intent, as the chancery court did in *Sellers* court did, the Supreme Court in *Centaur Partners* reached its conclusion by balancing competing policies. *Centaur Partners,* 582 A.2d at 927. On the one hand, supermajority provisions have the positive effect of protecting minority shareholders from oppression. *Id.* at 927-28. On the other hand, unless otherwise provided for, amendment of corporate charters, like other shareholder action, is generally by majority vote. 8 Del.C. §242(b)(1). Supermajority voting provisions have the negative effect of giving "minority shareholders the power to veto the will of the majority, effectively disenfranchising the majority." *Centaur Partners IV,* 582 A.2d at 927. Balancing these competing policies, courts have enforced supermajority voting requirements in corporate charters and bylaws only where the provisions are "clear and unambiguous." *Id.* These policies would apply equally in the context of this limited partnership, and balancing the policies would yield the same result as in *Sellers* and *Centaur Partners.*

sible, a court should give effect to *all* contract provisions.").[9] Therefore, partners with two-thirds of the partnership interests must consent to an amendment of section 5.8(c). The defendants cannot get that consent without a vote of the limited partners, and merger without consent would not be legal.[10]

9. Citing *Frankino v. Gleason,* 1999 WL 1032773 at *4 (Del. Ch.), *aff'd sub nom., McNamara v. Frankino,* 744 A.2d 988 (Del. 1999), the defendants argue that the court should not extend *Sellers* to limited partnership agreements. In *Frankino,* the court held that approval by a simple majority of shareholders was sufficient to amend a supermajority voting requirement in a corporation's director-approved bylaws. *Id.* at *4. The court distinguished *Sellers* and *Centaur Partners* as limited to amendments of shareholder-approved charters and bylaws. *Id.* at *4-5. Because the defendants want to amend a limited-partner-adopted limited partnership agreement, *Sellers* and *Centaur Partners,* not *Frankino,* are the more persuasive cases.

10. In light of this holding, the court does not now decide whether the general partner could have forced unwilling limited partners to sell their interests even had a supermajority of partners approved the merger. Section 2.4 of the agreement specifically bars the general partner from authorizing the purchase, cancellation or disposal of partnership units except as expressly provided for in the agreement. Section 5.8 specifically authorizes mergers, but does not specifically authorize mergers entailing purchases of partnership interests from unwilling partners. No other provision in the agreement expressly authorizes such a cash-out merger. See agreement §4.2 (authorizing partnership to purchase limited partner's interest at fair market value on limited partner's default in making his capital contributions); agreement §§2.5, 9.3 (requiring distribution of assets at fair market value on the sale of all or substantially all of the partnership assets or other event triggering the dissolution of the partnership); agreement §5.5 (giving the limited partners the option to buy the interest of a general partner at fair market value if the general partner is removed); and agreement §7.1 (allowing a limited partner to voluntarily transfer his interests only with the general partner's approval). And the court does not decide whether the defendants could amend section 2.4 by a simple majority vote. Compare section 5.5(ii) (requiring a simple majority vote to amend the agreement) with 11.13(A) (requiring unanimous written consent to amend the limited partners' distribution rights).

## B. PTP Breached Its Fiduciary Duties to the Limited Partners By Misrepresenting to Them That AIMCO and PTP Alone Could Approve the Merger

Though the record might support other breaches of fiduciary duty, the court need now only find one to support the injunction order:[11] PTP breached its fiduciary duty of full and fair disclosure to the limited partners by not informing them that they could vote on the merger.

Corporate directors owe a fiduciary duty to their shareholders to disclose fully all facts material to the transaction in an atmosphere of entire fairness. *Smith v. Van Gorkom*, 488 A.2d 858, 890 (Del. 1985); *Eisenberg v. Chicago Milwaukee Corp.*, 537 A.2d 1051, 1057 (Del. Ch. 1987). A fact is material if the plaintiff shows a "substantial likelihood that under all circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder." *Id.* A corporate general partner owes a fiduciary duty to limited partners of the limited partnership of which it is a general partner.[12] *Gotham Partners L.P. v. Hallwood Realty*

---

11. In support of his petition, Wurtzel has produced evidence that PTP breached its fiduciary duties to the limited partners by paying excessive management fees to its affiliate, failing to make distributions, informing the limited partners that prior tender offers by AIMCO were fair, misrepresenting that there were no merger plans when AIMCO made the prior tender offers, and approving the merger at an unfair price. The court does not address these claims. If Wurtzel succeeds on them, damages will be an adequate remedy.

12. Unless expanded or limited by the partnership agreement, the general partner has the fiduciary duty to manage the partnership in its interest and in the interests of the limited partners. 6 Del.C. §17-1101(d). *Sonet v. Timber Co. L.P.*, 722 A.2d 319, 322 (Del. Ch. 1998). There is nothing in the partnership agreement that would negate PTP's duty to fully and fairly disclose material information concerning the merger. Section 5.4 of the agreement allows PTP to perform any act if it deter-

*Partners L.P.,* 2000 WL 1476663 at *20 (Del. Ch.). Because the relationship between general partners and limited partners is similar to the relationship between directors and shareholders, general fiduciary principles for directors apply to general partners. *Cincinatti Bell Cellular Sys. Co. v. Ameritech Mobile Phone Serv. of Cincinatti Inc.,* 1996 WL 506906 at *12 (Del. Ch.), *aff'd,* 692 A.2d 411 (Del. 1997); *Litman v. Prudential-Bache Properties Inc.,* 611 A.2d 12, 15 (Del. Ch. 1992). Thus, a general partner has a like duty of full and fair disclosure.

Wurtzel has shown that PTP omitted a material fact from the May 29, 2001 letter. In the letter, PTP represented to the limited partners that it could effect the merger without a vote of the limited partners. This was untrue. While PTP told the limited partners that their only choices were tendering their partnership units for cash or tendering them for AIMCO units, the limited partners had an undisclosed third choice: keeping their partnership units pending a vote on the merger. There is a substantial likelihood that the omitted fact would have had

---

mines in good faith that the act is in the best interests of the partnership and that the act does not constitute negligence or misconduct. Section 5.4 does not apply because PTP cannot have determined in good faith that a merger without the required supermajority consent would be legal. The court also rejects the defendants' argument that section 5.7, which authorizes the general partner to engage in competing business ventures outside the partnership, abrogates any prohibition against self-dealing within the partnership. *Continental Ins. Co. v. Rutledge & Co.,* 750 A.2d 1219, 1236-37 (Del. Ch. 2000) (holding that the plain meaning of a substantially similar provision was to permit the general partners to engage in competing business activities outside of the partnership, not to alter the general partner's fiduciary duty to refrain from self-dealing).

actual significance in a reasonable limited partner's decision to tender partnership units. PTP's omission of this material fact violated its fiduciary duty.

### III. *The Deprivation of Wurtzel's Right To Vote on the Merger Is Irreparable Harm*

Wurtzel has clearly shown that the defendants proposed merger would deprive him of his right as a limited partner to vote on the merger. Though Delaware law governs those rights, Pennsylvania law governs whether a deprivation of those rights constitutes an immediate and irreparable harm issue. There seems to be no published opinion by a Pennsylvania appellate-level state court addressing the issue. Under Delaware law, however, the deprivation of a shareholder's right to vote is irreparable harm. *R.D. Hubbard v. Hollywood Park Realty Enters.*, 1991 WL 3151 at *5 (Del. Ch.) (holding that board's "thwarting shareholders' voting rights" to choose a board of directors constituted irreparable harm); *Mariner LDC v. Stone Container Corp.*, 729 A.2d 267, 279 (Del. Ch. 1998) (stating in dicta that deprivation of the claimed right to vote on a merger cannot be remedied once the merger has been accomplished). This rationale is consistent with decisions in Delaware enjoining companies to make full and fair disclosures to allow shareholders to make informed and uncoerced decisions between two alternatives. *Eisenberg v. Chicago Milwaukee Corp.*, 537 A.2d 1051, 1062 (Del. Ch. 1987) (enjoining tender offer because directors did not adequately disclose terms); *Sealy Mattress Co. of N.J. v. Sealy Inc.*, 532 A.2d 1324, 1340-41 (Del. Ch. 1987) (enjoining

cash-out merger because "plaintiffs have not received sufficient information to make an informed decision among the available alternatives . . . . In this case the inability to make that choice constitutes irreparable harm. . . ."); *In re Anderson Clayton Shareholders' Litig.,* 519 A.2d 669, 677, 679 (Del. Ch. 1986) (enjoining recapitalization plan where shareholder vote approving that plan did not accurately reflect shareholders' choice because the shareholders based their vote on inaccurate and misleading disclosures by directors); *Joseph v. Shell Oil,* 482 A.2d 335, 344 (Del. Ch. 1984) (enjoining tender offer because permitting minority shareholders to tender their share without full disclosure of terms of offer "might forever deny to those tendering stockholders their right to be treated fairly"). See also, *In re Western Nat'l Shareholders Litig.,* 1998 WL 51733 at *1-2 (Del. Ch.) (holding that the focus of irreparable harm determination in *Eisenberg, Andersen* and *Joseph* was whether the inadequate disclosure rendered the shareholder's vote an inadequate expression of his choice). Because Delaware law governs the right deprived, and because general principles of corporation law define the duties that a general partner owes to limited partners, the court finds these Delaware corporation cases persuasive. If equity will bar a company from forcing a shareholder to make an uninformed vote, then equity will certainly bar the company from preventing the shareholder from voting at all.[13]

---

13. Wurtzel asserts several other sources of irreparable harm, including (1) the merger will cause Wurtzel to lose his standing to assert a derivative claim, (2) the merger will cause Wurtzel to lose his rights as a limited partner, and (3) the limited partnership interest is an investment in real estate and thus is unique. These asserted harms would

Defendants are wrong in arguing that this case is only about money. Had the defendants gotten the supermajority consent of the partners after fully and fairly disclosing the terms of the merger, but paid an unfair price, damages would be an adequate remedy for Wurtzel. See *Kohls v. Duthie,* 765 A.2d 1274, 1289 (Del. Ch. 2000) ("Because I cannot now conclude that they are being asked to make decisions regarding the transaction on the basis of improper disclosures, there is no irreparable harm in putting them to the decision of how to respond to the proposed transaction."). Wurtzel has shown that the defendants have done more than simply pay a low price. They have deprived Wurtzel of his right to vote on the merger and they have coerced the limited partners to tender their partnership interests based on a misrepresentation that the merger could occur without a vote of the limited partners. Their actions threaten imminent irreparable harm that damages will not compensate.

IV. *An Injunction Barring the Defendant From Buying Other Limited Partners' Shares and From Undertaking the Merger Will Preserve the Status Quo and Will Be Reasonably Suited To Abate the Defendants' Wrongs*

In granting a preliminary injunction, a court must "preserve the status quo, as it exists or previously existed

---

likely not support granting an injunction. See *Kohls v. Duthie,* 765 A.2d 1274, 1289 (Del. Ch. 2000) (holding under Delaware law that loss of standing to make a derivative claim is not irreparable harm); *Scattergood v. Perelman,* 1990 WL 72801 at *4 (E.D. Pa. 1990) (holding that deprivation of the future value of stock is not irreparable harm); 6 Del.C. §17-701 ("A partnership interest is personal property. A partner has no interest in specific limited partnership property."). But the court need not address that issue because loss of the right to vote on the merger is irreparable harm.

before the acts complained of . . . ." *Smotkin v. Manhattan-Ward Inc.*, 363 Pa. Super. 597, 600, 526 A.2d 1223, 1224 (1987). Furthermore, a preliminary injunction must be reasonably suited to abate the wrong. *School Dist. of Wilkinsburg v. Wilkinsburg Education Ass'n,* 542 Pa. 335, 338 n.2, 667 A.2d 5, 6 n.2 (1995). These two tests require the court to decide exactly what conduct to enjoin.

Wurtzel asks the court to continue the relief granted in the TRO by enjoining the defendants from engaging in "any transaction which would limit, transfer, assign or extinguish the rights of any limited partner in [the partnership], including but not limited to the contemplated merger of [the transitory company] with and into the partnership." Plaintiff's proposed order at 2. The court interprets this as a request to enjoin the merger and to enjoin the defendants from buying the limited partners' partnership units. The court will grant this relief.

The defendants plan to merge without the required consent of the partners. By sending out an information statement misrepresenting that the minority limited partners had no choice in the matter, the defendants have coerced the minority limited partners to surrender their partnership interests. A preliminary injunction barring the illegal merger and barring the defendants from further purchasing the limited partners' interests is reasonably suited to abate these harms. Such an injunction will preserve the status quo by preventing the defendants from buying limited partnership interests and from carrying out the merger.

Wurtzel's request for a TRO, which the court granted, sought prospective relief only. Likewise, the proposed injunction order and petition seek prospective relief. Wurtzel has not expressly asked the court to undo any

pre-TRO transfers of partnership units and Wurtzel does not propose how the court would do so. Therefore, the order will merely continue the relief granted by the TRO.

The court makes no decision as to the effect of pre-TRO transfers or whether AIMCO may exercise rights coincident with partnership interests that it bought from May 29 to June 28, 2001. But, see *Continental Ins. Co. v. Rutledge & Co.*, 750 A.2d 1219, 1239 (Del. Ch. 2000) ("In Delaware, it remains a fundamental principal that a disloyal fiduciary may not profit from his breach."). There is evidence that AIMCO continued to purchase partnership units after June 28, 2001, in violation of the TRO. That evidence is not clear, and the court makes no decision as to the effect of any partnership unit transfers undertaken in violation of the TRO. If future evidence shows that the defendants violated the TRO, the court will grant appropriate relief as necessary.[14]

## V. *Refusing the Injunction Would Cause Greater Injury Than Denying the Injunction*

Wurtzel must show that there would be greater injury resulting from denying the injunction than from grant-

---

14. According to AIMCO's vice president, Dora Chi, about 30 limited partners had elected as of July 27, 2001 to trade their partnership units for AIMCO units, and 50 had elected to receive cash. One limited partner had elected to invoke appraisal rights, and two had entered into separate purchase agreements with AIMCO. Not all partners had made an election. Exhibit D-H, Chi aff. ¶¶6-9. Chi's affidavit does not disclose if and when AIMCO completed these transactions, but there is evidence that AIMCO continued to buy partnership units after the court's June 28, 2001 TRO restrained the defendants from making any transactions that would limit, transfer, assign or extinguish the rights of any limited partner. Exhibit P-24, list of partners who opted to receive cash or AIMCO units; exhibit P-10, Foye dep. at 114.

ing it. *DiLucente Corp. v. Pennsylvania Roofing Co. Inc.,* 440 Pa. Super. 450, 456, 655 A.2d 1035, 1037 (1995).

The defendants argue that enjoining the merger will ·cause the partnership to continue to bear expenses disproportionate to the number of partners. The defendants have produced no evidence of this harm.[15] In any event, the alleged harm is monetary. The defendants argue that enjoining the merger will prevent other limited partners from receiving cash or AIMCO units for an illiquid investment. See *Kohls v. Duthie,* 765 A.2d 1274, 1289 (Del. Ch. 2000) ("This court is understandably cautious when the issuance of an injunction 'would deprive . . . shareholders of the benefits of [a] merger transaction without offering them any realistic prospect of a superior alternative, or for that matter, any alternative.' "). Though this harm is compelling, it is not imminent. The suitor, AIMCO, is an insider that is not likely to go away. Preliminarily enjoining the merger will not prevent AIMCO from trying the merger if the court later vacates the injunction. On the other hand, allowing the merger to take place will definitely deprive Wurtzel and the other minority limited partners of their right to approve or disapprove the merger—a harm that is imminent and not reparable by damages.

---

15. In her affidavit, AIMCO Vice President Dora Chi averred "that the annual maintenance costs for the partnership in its current form are approximately $360,000." Chi aff. ¶4. Since Chi did not aver the amount of the maintenance costs for the partnership in its merged form, the court cannot find that any savings would result from the merger.

## CONCLUSIONS OF LAW

(1) The general partner and two-thirds of the interests of the limited partners and general partner must consent to the merger.

(2) A merger without the two-third consent would violate the partnership agreement.

(3) PTP had a fiduciary duty to disclose to the limited partners that the merger required the consent of two-thirds of the interests of the limited partners and general partner.

(4) Wurtzel has a clear right to relief on his claim that the partnership and PTP breached the partnership agreement by failing to obtain the required supermajority approval.

(5) Wurtzel has clear right to relief on his claim that the PTP breached its fiduciary duty to the limited partners by misrepresenting that the merger could take place with the consent of only AIMCO and PTP.

(6) The threat that the defendants will deprive Wurtzel of his right to vote on the merger and coerce the limited partners to tender their partnership interests based on a misrepresentation that they had no voting rights is an imminent irreparable harm for which damages are not an adequate remedy.

(7) Preliminarily enjoining the defendants from undertaking the illegal merger and from purchasing limited partners' shares would preserve the status quo.

(8) Greater injury will occur from refusing the injunction than from granting it.

(9) A preliminary injunction barring the illegal merger and barring the defendants from purchasing limited partners' units will be reasonably suited to abate the defendants' wrongs.

## CONCLUSION

On the basis of the record, the court will enter a contemporaneous order preliminarily enjoining the defendants from undertaking the illegal merger and purchasing limited partners' units.

## ORDER

And now, September 11, 2001, on consideration of the plaintiff's petition for a preliminary injunction, the defendants' response, the oral argument and all relevant documentation, and in accordance with the court's contemporaneously-filed opinion, it is hereby ordered that

(1) The petition is granted;

(2) The defendants are preliminarily enjoined from purchasing limited partnership units from the limited partners of defendant Park Towne Place Associates Limited Partnership;

(3) The defendants are preliminarily enjoined from undertaking the announced merger of defendant Park Towne Place Associates Limited Partnership with Park Towne Place Transitory Company LLC; and

(4) The plaintiff shall post a bond of $10,000 in accordance with Pa.R.C.P. 1531(b) within 10 days of the entry of this order.